**KALIELGOLD PLLC**

Jeffrey D. Kaliel (SBN 238293)
Amanda J. Rosenberg (SBN 278507)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4733
jkaliel@kalielpllc.com
arosenberg@kalielgold.com

Sophia G. Gold (SBN 307971)
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar No. 330990)
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com

*Counsel for Plaintiffs and Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORNA VOLLMUTH AND STEPHANIE STRONG, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>DREAM GAMES TEKNOLOJİ ANONİM ŞİRKETİ,<br><br>       Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, ET SEQ.;**<br><br>2. **VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT, WASH REV. CODE §§ 19.86.010, *ET SEQ;* AND**<br><br>3. **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.     Plaintiffs, Lorna Vollmuth and Stephanie Strong, bring this action on their own behalf and all others similarly situated against against Defendant, DREAM GAMES TEKNOLOJİ ANONİM ŞİRKETİ, to secure redress for violations of the California Business and Professions Code §17200, *et seq.* and the Washington Consumer Protection Act §§19.86.010, *et seq.*

## NATURE OF THE ACTION

2.     Plaintiffs bring this action on behalf of themselves, the general public, and a proposed class of similarly situated consumers for the unlawful, deceptive, and misleading trade practices (dark patterns and addictive gambling in-game features such as "loot boxes") engaged in by Defendant, a provider of some of the most popular video games in the world.

3.     One of Defendant's most popular games is Royal Match, which is considered one of the largest "match-3 puzzle" games in the market and touts more than fourteen million active players.[1]

4.     Royal Match is absurdly lucrative. As of April 2024, fueled by in-app purchases and microtransactions, Royal Match had generated over $3 billion in player spending since its launch in 2021.[2] In fact, Royal Match "reached the $3 billion landmark just five months after making the double-billion."[3]

5.     Royal Match's rampant success is due to its creation of a game that incorporates traditional puzzles, level advancing, and social gaming aspects but also incorporates gambling elements at its center, including, but not limited to, a multitude of "match-3" or "tile-matching" games, meaning that the player must

---

[1] https://activeplayer.io/royal-match/ (last accessed August 29, 2024).

[2] https://www.pocketgamer.biz/royal-match-races-from-2-billion-to-3-billion-earnings-faster-than-any-other-game/ (last accessed August 29, 2024).

[3] *Id.*

usually complete levels by matching three (or more) of the same type of object in a line.

6.    There are five different objects for matching in Royal Match: Book, Crown, Leaf, Shield, and Gem.

7.    Players clear objects from a game board in Royal Match by matching three or more of the same type of object in a row or column.

8.    When a player makes a match, the objects are cleared from the game board and new objects drop from the top to fill the game board.

9.    Players must complete a level in a certain number of moves.

10.    Players who win a level in Royal Match are awarded virtual coins.

11.    Coins in Royal Match can be used to purchase additional moves to continue playing a level once all of the players' moves for that level have been exhausted.

12.    Coins in Royal Match can also be used to purchase additional lives to all players to continue playing levels.

13.    If a player loses a level in Royal Match, the player loses a life.

14.    When a player loses all of their lives and gold coins, they are unable to continue playing the games in Royal Match.

15.    Royal Match provides a limited number of free lives and coins to players. After players inevitably lose their allotment of lives and coins to Royal Match's games of chance, Defendant attempts to sell players additional coins to continue playing. Without additional coins, players cannot play Royal Match's games of chance.

16.    Freshly topped off with additional coins, players convert them to lives to continue playing the games of chance in Royal Match.

17.    The coins won by players playing Defendant's games of chance are identical to the coins that Defendant sells. Thus, by wagering coins that consumers

purchase, consumers have the chance to win additional coins that they would otherwise have to purchase. These coins extend players' privilege to continue playing the games of chance in Royal Match.

18.     The Ninth Circuit in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018) held that the mobile game Big Fish Casino "constitutes illegal gambling under Washington law." *Id*. The Court reached this conclusion, in part, on the basis that the virtual chips offered in Big Fish Casino were things of value because they extended the right of players to play the games in Big Fish Casino.

19.     Similarly, the gold coins in Royal Match are things of value.

20.     Further, to maximize the amount of money each user spends in Royal Match, Defendant advertises coin bundles in Royal Match that Defendant misleadingly states are on sale for a limited time. In reality, the coin bundles are not truly discounted and the sale offers are not truly limited in time.

21.     Further, Royal Match's success is further driven by the Defendant's use of "dark patterns" - deceptive design techniques used by websites and apps to trick users into making decisions they wouldn't otherwise make. Dark patterns, like the many examples found in Royal Match, are designed to get users to give up their time, privacy, or personal information and can benefit the business at the expense of the user's choice.

22.     Unlike a regular casino, players of social casino games like Royal Match do not (subject to some exceptions) win real-money rewards for their spending.

23.     Users of social casino games like Royal Match, however, often migrate to engagement in conventional gambling activities, with high rates of problem gambling.[4]

---

[4] David Zendle, "Beyond loot boxes: a variety of gambling-like practices in video games are linked to both problem gambling and disordered gaming," *PeerJ* 8 (2020): e9466.

24.    Social scientists have established clinically significant links between social gaming and problem gambling behavior.

25.    Royal Match goes beyond the "social casino" category by promoting and profiting from prohibited gambling activity through the "Card Collection" feature (shown below):



26.    Players collect cards to complete their card collections, which provide in-game advantages and unlock exclusive rewards.

27.    One of the best ways to get Royal Match Cards is by opening "Royal Match Card Packs" (hereinafter referred to as "Card Packs") which are known in the gaming industry as "Lootboxes." Players can acquire these Card Packs through daily gameplay events/goals and by progressing through the puzzle portion. However, when players run out of virtual currency or lives (required for game progression and

obtaining Card Packs) players can purchase more virtual currency with real money via the in-game store to ultimately obtain more Card Packs.

28.    Defendant marketed these Card Packs, as well as other types of promotional packs (i.e. Lootboxes) through "intermediate currency" to players, a critical and lucrative aspect of this game. The Card Packs and other in-game Lootboxes were advertised in game as possibly containing valuable unlockable prizes that allowed players to upgrade and/or advance their playing advantage. Nothing players did in game increased or altered their chances of what would be unlocked when a Card Pack or other type of Lootbox was opened even though what was won could advance a player. Players such as Plaintiffs were not told in advance what was inside any particular Card Pack, Lootbox, or the odds of winning something which may be contained in the Card Pack or Lootbox, and thereby were functionally gambling on the chance of hopefully winning some valuable prize.

29.    Defendant's unfair, deceptive, and unlawful acts or practices of allowing players to pay real-world currency to gamble on winning in-game items, implemented in conjunction with undisclosed "dark patterns" that steered players towards  making  such purchases and making it particularly difficult to advance in the game otherwise, as well as refusing to provide refunds to users who made in-game purchases, have through such omissions deceived, misled,  and  harmed  consumers who comprise a large segment of Defendant's player population. Plaintiffs and other consumers, as well as the general public, have been impacted or injured as a result of Defendant's practices, including, but not limited to, having suffered out-of-pocket loss.

30.    Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated Royal Match players who were lured into making in-game purchases. Plaintiffs, on behalf of themselves and the Classes, seek damages, restitution, declaratory and injunctive relief.

## JURISDICTION AND VENUE

31.    Jurisdiction is proper under 28 U.S.C. § 1332 as the amount in controversy exceeds the sum of $75,000. Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiffs alleges a class, which will result in at least one class member belonging to a different state than that of Defendant. Plaintiffs seeks up to $1,500.00 (one-thousand-five-hundred dollars) in damages for each call in violation of the OTSA, which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 (five-million 2 dollars) threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA"). Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

32.    The Court has personal jurisdiction over Defendant and venue is proper in this District because, Plaintiff Lorna Vollmuth resides in this District, Defendant directs, markets, and provides its business activities to this District, and because Defendant's unauthorized marketing scheme was directed by Defendant to consumers in this District and throughout the United States.

33.    Plaintiffs have standing to bring this action pursuant to the Washington Consumer Protection Act, Wash Rev. Code §§ 19.86.010, et seq.; the California Unfair Competition Law, California Business and Professions Code § 17200, et seq. ("UCL"); and the common law.

## PARTIES

34.    Plaintiff Lorna Vollmuth is a natural person who, at all times relevant to this action, was a resident of Los Angeles County, California.

35.    Plaintiff Stephanie Strong is a natural person who, at all times relevant to this action, was a resident of Snohomish County, Washington.

36.    Defendant Dream Games is headquartered in Istanbul, Turkey. On information and belief, the address for the corporate office of Dream Games

Teknoloji Anonim Şirketi is Esentepe Mahallesi, Büyükdere Caddesi Maya Akar Center, B Blok No:102/106 Şişli, İstanbul, Turkey.

37.    Defendant directs, markets, and provides its business activities throughout the United States, including throughout the states of California and Washington.

38.    Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, vendors, and insurers of Defendant.

## COMMON FACTUAL ALLEGATIONS

## I.    Dark Patterns in Royal Match

39.    Royal Match is a mobile game with the main objective of assisting "King Robert" in decorating his castle by solving colorful match-3 levels. Royal Match consists of hundreds of levels and various challenging obstacles, the game combines strategic thinking and creativity – as well as a multitude of "dark patterns" to manipulate users, keeps users addicted to its gameplay, and and utilize biases and heuristics.

40.    Dark patterns are online user interfaces that are, amongst other reasons, intended to achieve a financial goal for those who implement them by manipulating users into taking certain actions or making certain decisions against their own interests.[5]

41.    Dark patterns are undisclosed and work by exploiting cognitive biases, and "often employ strategies that render the ease of selecting different options asymmetric, cover up the mechanisms by which consumers are influenced,

---

[5] Jamie Luguri, Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. Legal Analysis, Issue 1, 2021, Pages 43–109, https://doi.org/10.1093/jla/laaa006.

deceive users through acts or omissions, hide relevant information, or restrict choices likely to be popular among consumers."[6]

42.   The term "dark patterns" was coined to convey the unscrupulous nature of such design elements "and also the fact that [they] can be shadowy and hard to pin down."[7]

43.   The FTC has provided some concrete examples of "dark patterns" deemed deceptive.[8] This includes several specific dark patterns found in Royal Match and detailed below with specific examples.

44.   The FTC considers dark patterns to be "unfair or deceptive" business practices under Section 5 of the FTC Act, and a September 2022 FTC Staff Report titled "Bringing Dark Patters to Light"[9] made clear that "these practices are squarely on the FTC's radar."

45.   A 2023 CFPB Policy Statement on Abusive Acts or Practices[10] likewise referenced "manipulations such as the use of pop-up or drop-down boxes, multiple click-throughs, or other actions or 'dark patterns.'"

46.   In the last two years, enforcement actions brought by these agencies include:

- FTC v. Epic Games (2023): Alleged the company used dark patterns to charge consumers for in-game purchases without first obtaining their

---

[6] *Id.* (citing Mathur, Arunesh, Jonathan Mayer, and Mihir Kshirsagar. *What Makes a Dark* Pattern.. Dark? Design Attributes, Normative Considerations, and Measurement Methods, ACM Conference on Human Factors in Computing Systems. 2021 (available at https://dl.acm.org/doi/10.1145/3411764.3445610).

[7] Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf (last accessed August 19, 2024).

[8] FTC Staff Report, *Bringing Dark Patters to Light* (September, 2022) (available at: https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf ).

[9] *Id.*

[10] https://files.consumerfinance.gov/f/documents/cfpb_policy-statement-of-abusiveness_2023-03.pdf (last accessed August 29, 2024).

express informed consent and then banned consumers from accessing previously paid-for content when they have disputed unauthorized charges with their credit card providers; Epic settled for $245 million.

- FTC v. Amazon (2023): Alleged the company used dark patterns to trick customers into enrolling and automatically renewing Prime subscriptions; case is currently pending.

- FTC v. Vonage (2022): Alleged the company made it difficult to cancel service, imposed early termination fees without clear disclosure and charged customers after cancellation request; Vonage settled for $100 million.

- FTC v. Credit Karma (2022): Alleged the company falsely said consumers were "pre-approved" for a credit card; Credit Karma settled for $3 million.

- CFPB v. One Main (2023): Alleged the company manipulated customers into purchasing add-on products; One Main settled for $20 million.

- CFPB v. TransUnion (2022): Alleged the company misrepresented the cost of services. The case is currently pending.

47.    Many of the same dark patterns employed by these companies referenced above are also prevalent in Royal Match, as explained below.

48.    Users can download and play Royal Match in Apple and Android devices in the United States through the App Store and Play Store, respectively.

49.    The primary gameplay in Royal Match are match-3 puzzles where users are presented with various levels having specific goals for clearing objects in the puzzle within a certain number of moves:

///

///

///

///

///



50.    The type and sequence of objects that populate the game board in Royal Match materially determines the outcome of a level. Specifically, whether a player successfully wins or loses a level in Royal Match is materially determined by the type and sequence of objects that populate the game board initially and that populate the game board as the player clears objects.

51.    The type and sequence of objects that populate the game board in Royal Match are determined by chance. Accordingly, the games offered in Royal Match are games of chance.

///

///

52.     When a user matches three or more objects on the puzzle board, the objects clear from the board. The remaining objects drop down to fill the resulting empty spaces and new objects drop from the top of the puzzle board to fill the board.

53.     On information and belief, the type and sequence of objects that fill the game board in Royal Match after a player clears objects from the board are determined by chance.

54.     The type and sequence of objects that fill the game board as a player clears objects from the game board materially determine whether a player successfully completes the level within the required number of moves. "Lives" in Royal Match represent the number of attempts a player has to beat a level. If players have one or more lives, they can click on a level and play it. If players do not have any lives remaining, they cannot play the level.

55.     If a user is unable to complete a level within the required number of moves, the player must expend virtual gold ("coins") to continue playing the level and to refill lives in Royal Match.

56.     If a player runs out of lives and has insufficient coins to refill their lives, they must purchase additional coins to continue playing:



57.     Defendant's implementation of the sale of coins as in-game currency required to keep playing Royal Match, amounts to the dark pattern recognized by the FTC as "intermediate currency."[11]

58.     In Royal Match, the desired task of playing the game is interrupted several times due to the overwhelming presence of pop-ups to interfere in the task-flow. Immediately after a player runs out of lives, the user is presented with the pop-up, shown below:



59.     Similarly, if a user cannot complete a level within the required number of moves, the player is presented with the pop-up, below:

///

///

///

11
https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf (last accessed August 29, 2024).

1
2
3
4
5
6
7
8
9
10
11
12
13



14    60.    If the player taps the red "x" button, the level is failed and a life will be

15  lost. However, player can spend coins (which players can acquire by spending real

16  world currency) to continue gameplay. This dark pattern used by Defendant is

17  recognized by the FTC as "pay-to-play."[12]

18    61.    Additionally, this dark pattern further preys on the consumers with the

19  offer's subtext "Special Offer," with the intention of tricking the user even more into

20  believing the advertised purchase option is a great deal and in their best interest.

21  ///

22  ///

23  ///

24  ///

25

26  _____

[12]

27  https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14

.2022%20-%20FINAL.pdf (last accessed August 29, 2024).

28



62.    Royal Match also presents the option to invite friends via Facebook and offers items as a reward:

63.    The implementation of a "social pyramid" dark pattern disturbs the user's decision-making process. Furthermore, when the user falls for the social pyramid pattern and invites one or more friends, the disguised ad's dark pattern is manifested because the invitation is a free ad for the app.

64.    Besides that, the developers have implemented the forced action strategy by offering rewards when users connect the app with Facebook.

///

65.     All implemented dark patterns have the goal to increase revenue by tricking users into buying in-app purchases or inviting their friends to play the game to increase the user base and acquire potentially new paying customers.

66.     The FTC has deemed these intentionally designed, omission-based dark patterns of "intermediate currency," "social pyramid," and "pay to play" in the Royal Match game to create coercive action and consist of unlawful, unfair, or deceptive acts or practices.

## II.     Lootboxes in Royal Match

67.     Broadly speaking, a Lootbox is a video game microtransaction in which the consumer purchases a reward containing one or more virtual items of differing value or rarity that is assigned at random.[13] Lootboxes are defined in the dictionary as "a box containing a prize of unknown value, especially one offered for sale to players as part of an online game."[14]

68.     Although video game providers advertise and portray lootboxes as a vehicle that allows users to quickly advance further in a game through purchases using real-world currency, the use of Lootboxes and associated omissions in video games is overwhelmingly misleading and exploitative of consumers like Plaintiff.

69.     Over the past decade, Lootboxes have been the epicenter of a host of issues that have caused lawsuits and law reform around the world because of their addictive and predatory nature as Lootboxes are often used in free-to-play video games as the main source of revenue for video game providers, but players very rarely actually end up getting anything valuable when they purchase a Lootbox.[15]

---

[13] https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf (last accessed August 9, 2024).

[14]  https://www.collinsdictionary.com/us/dictionary/english/loot-box  (last accessed  August  9, 2024).

[15]  *See*  https://www.gamechangerslaw.com/p/italian-regulators-recent-loot-box  (last  accessed August 9, 2024); https://screenrant.com/lootbox-gambling-microtransactions-illegal-japan-china-belgium-netherlands/(last                accessed                August                9,                2024);

CLASS ACTION COMPLAINT

70.     In fact, as of April 2023, Lootboxes have generated a whopping $15 billion per year in revenue for gaming companies like Defendant.[16]

71.     One of the most problematic issues with Lootboxes universally is that despite their use in games that are marketed with "dark patterns," Lootbox purchases are often non-refundable—as is the case with Defendant's Royal Match in-game purchases.[17]

72.     As previously mentioned, Royal Match implements Lootboxes into the game in a number of ways, including but not limited to Royal Match Card Packs.

73.     By way of example, Card Packs are items in Royal Match that you can win or purchase from the store. They contain a set amount of stickers of varying rarity, which players can use to fill up their Card Collections in exchange for other types of in-game rewards such as in-game currency or even other special features.

74.     If all the collections in an album are completed one is given more prizes than those received after each set is done.

///

///

///

///

///

///

///

---

[https://www.gamedeveloper.com/business/washington-state-senator-introduces-bill-to-tackle-the-big-loot-box-debate](https://www.gamedeveloper.com/business/washington-state-senator-introduces-bill-to-tackle-the-big-loot-box-debate) (last accessed August 9, 2024); and [https://www.nprillinois.org/statehouse/2021-05-04/illinois-house-approves-adding-warnings-to-video-games-that-include-loot-boxes](https://www.nprillinois.org/statehouse/2021-05-04/illinois-house-approves-adding-warnings-to-video-games-that-include-loot-boxes) (last accessed August 9, 2024).

[16] [https://hbswk.hbs.edu/item/the-15-billion-question-have-loot-boxes-turned-video-gaming-into-gambling](https://hbswk.hbs.edu/item/the-15-billion-question-have-loot-boxes-turned-video-gaming-into-gambling) (last accessed August 9, 2024).

[17] [https://www.dreamgames.com/en/terms](https://www.dreamgames.com/en/terms) ("Dream Games does not issue any refunds or offer any exchanges of any products purchased on or through the Services") (last accessed August 29, 2024).



75.    These Card Packs are promotional "Lootboxes" are typically available for purchase with real money and are offered for a limited time, often as part of a special promotion or event within the game.

76.    Critically, as with traditional lootboxes, when a player purchases Card Packs, they are not told or shown anything about the gifts or unlockable prizes they will actually receive. In addition to omitting what can be won, there is a complete omission of the odds of winning any prize. Furthermore, even though like with most other games utilizing "lootboxes" a player may attain some prizes at a faster rate by having the player pay directly for them, the chances of a player drawing rare valuable items through the Sticker Pack is still designed to be very small. Thus, in order to keep up and gain valuable items to remain competitive in gameplay, players  must make large amounts of in-game purchases using real-world currency so that they can acquire rarer and more valuable Card Packs.

77.    As with other Lootbox games, Defendant's Lootbox mechanism capitalized on and encouraged addictive behaviors, akin to gambling. The Card

Pack Lootboxes offered in Royal Match, along with other various Lootboxes in Royal Match meet the definition of gambling as set forth in a multitude of gambling statutes and regulations and rely on the same predatory practices designed to induce consumers to spend money on games of chance.

## III.    Lootboxes Constitute Gambling in Violation of California Law

78.    Lootboxes are a gambling device and constitute a form of gambling in violation of California law. Cal. Penal Code §§ 330, *et seq.* Further, by "exposing [loot boxes] for play," Defendant is conducting a gambling operation in violation of California's Gambling Control Act. Cal. Bus. & Prof. Code §§ 19800, *et seq.*

### A.    Violations of California Penal Code §§ 330, et seq.

79.    Under California law, Lootboxes constitute illegal "slot machines or devices" when played on a mobile phone, tablet, computer, or other similar device. California Penal Code § 330b(d) broadly defines an unlawful "slot machine or device" as:

> a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

80.    The California Bureau of Gambling Control describes a "gambling device" as follows:

> California's gambling device statutes are broad in their coverage and prohibit any person from owning, renting, or possessing illegal gambling devices. (Penal Code, §§ 330a, 330b, 330.1.) An illegal gambling device has three features:
>
> 1. It is a machine, apparatus, or device (coin operation is not required);

2. Something of value is given to play the device; and

3. The player has the opportunity to receive something of value by any element of hazard or chance ("something of value" is not limited to coins, bills, or tokens—it also includes free replays, additional playing time, redemption tickets, gift cards, game credits, or anything else with a value, monetary or otherwise.) (Penal Code, §§ 330a, 330b & 330.1.)[18]

81.    The Lootboxes at issue meet this definition. First, a player uses his or her mobile device to download Royal Match that offers Lootboxes in the form of Card Packs, turning the mobile device into a device on which to play a loot box. Second, something of value is used to purchase the Lootboxes on Royal Match, either when the player purchases coins with money to buy chances on loot boxes, or when coins, which are property, are used. Third, the Lootboxes in Royal Match offer the players a randomized chance to obtain something valuable.

82.    The potential prizes are "things of value," both to the players who spend to win rare prizes and otherwise. California law broadly defines the types of prizes that come within its gambling prohibitions. Any "thing of value," regardless of whether it is capable of being turned into money, is sufficient. Here, people are willing to spend money to try to win these digital goods, whether they are cosmetic or improve gameplay. By its very nature, the purpose of purchasing and opening a Lootbox is to win something of value. A chance to win a thing of value is the *sine qua non* of selling loot boxes. Defendant is well aware of this.

**B.    Violations of California Penal Code §§ 330, et seq.**

83.    Under California's Gambling Control Act, all "controlled games" constitute "gambling" and anyone who "exposes for play one or more controlled games that are dealt, operated, carried on, conducted, or maintained for commercial

---

[18] Bureau of Gambling Control, Law Enforcement Advisory: Illegal Gambling Devices (Nov. 1, 2010), https://www.abc.ca.gov/wp-content/uploads/2019/06/Law-Enforcement-Advisory-Illegal-Gambling-Devices-1.pdf.

gain" is conducting a "gambling enterprise" or "gambling operation." *See* Cal. Bus. & Prof. Code §§ 17805(l) ("'Gambling' means to deal, operate, carry on, conduct, maintain, or expose for play a controlled game."), 17805(g) (defining "controlled game"), 17805(m) (defining "gambling enterprise"), 17805(q) (defining "gambling operation").

84.    Lootboxes constitute a "controlled game" because they are a "game of chance…played for currency, check, credit, or any other thing of value." Cal. Penal Code § 337j(1).

85.    The marketing and sale of Lootboxes also violates the spirit and public policies behind California's Gambling Control Act. The Gambling Control Act provides that "gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families," "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order," and no "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies." *See* Cal. Bus. & Prof. Code §§ 17801(c), (d); *see also* Cal. Bus. & Prof. Code §§ 19850, 19851, 19852 (requiring state gambling licenses).

86.    By exposing Lootboxes for play for commercial gain in Royal Match, Defendant is operating an illegal gambling enterprise that is inimical to the public health.

## FACTS SPECIFIC TO PLAINTIFFS

### *Plaintiff Lorna Vollmuth's Experience*

87.    Plaintiff Lorna Vollmuth played Royal Match from approximately mid-2023 to September, 2024 during which she purchased coins, Card Packs, or other in-game Lootboxes numerous times.

88.    Plaintiff Vollmuth spent approximately one hundred dollars, in real-world currency, in Royal Match during that time.

89.    Throughout her time playing Royal Match, Plaintiff Vollmuth was never informed of and was thus unaware of the odds of receiving any reward (including any specific Card, reward, etc.) when she made in-game purchases with real-world currency to acquire coins, Card Packs or other in-game Lootboxes.

90.    Plaintiff Vollmuth was also unaware that any purchases she made from Defendant were non-refundable.

91.    Plaintiff Vollmuth almost never received any valuable reward from the coins, Card Packs or other in-game Lootboxes she had purchased during his time playing Royal Match and would not have made the number of in-game purchases that she did had she known the true odds of her being able to obtain any reward from the coins, Card Packs or other in-game Lootboxes, or that she would not be allotted a refund.

92.    Plaintiff Vollmuth no longer plays Royal Match and wishes that she had never made the purchases that she did and that she had obtained a full refund for them. If, however, Royal Match were to change its practices and comply with the law, Plaintiff Vollmuth would consider playing Royal Match again in the future.

93.    Based on Royal Match's misrepresentations and omissions, Plaintiff Vollmuth made numerous in-game purchases that were labeled non-refundable using her funds. Even then, none of the charges described the purchases that were made and that Plaintiff had been essentially repeatedly gambling on winning a valuable in-game item by purchasing Defendant's coins, Card Packs or other in-game Lootboxes.

***Plaintiff Stephanie Strong's Experience***

94.    Plaintiff Stephanie Strong played Royal Match from approximately mid-2023 to early September, 2024 during which she purchased coins, Card Packs or other in-game Lootboxes numerous times.

95.    Plaintiff Strong spent thousands, in real-world currency, in Royal Match during that time.

96.     Throughout her time playing Royal Match, Plaintiff Strong was never informed of and was thus unaware of the odds of receiving any reward (including any specific Card, reward, etc.) when she made in-game purchases with real-world currency to acquire coins, Card Packs or other in-game Lootboxes.

97.     Plaintiff Strong was also unaware that any purchases she made from Defendant were non-refundable.

98.     Plaintiff Strong almost never received any valuable reward from the coins, Card Packs or other in-game Lootboxes she had purchased during his time playing Royal Match and would not have made the number of in-game purchases that she did had she known the true odds of her being able to obtain any reward from the coins, Card Packs or other in-game Lootboxes, or that she would not be allotted a refund.

99.     Plaintiff Strong no longer plays Royal Match and wishes that she had never made the purchases that she did and that she had obtained a full refund for them. If, however, Royal Match were to change its practices and comply with the law, Plaintiff Strong would consider playing Royal Match again in the future.

100.    Based on Royal Match's misrepresentations and omissions, Plaintiff Strong made numerous in-game purchases that were labeled non-refundable using her funds. Even then, none of the charges described the purchases that were made and that Plaintiff had been essentially repeatedly gambling on winning a valuable in-game item by purchasing Defendant's coins, Card Packs or other in-game Lootboxes.

## CLASS ALLEGATIONS

101.    Plaintiffs brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and all others similarly situated defined as follows:

102.    The Classes are defined as follows:

**California Class**: All California residents who, during the applicable limitations period, made in game purchases in Royal Match using real-world currency.

**Washington Class**: All Washington residents who, during the applicable limitations period, made in game purchases in Royal Match using real-world currency.

103. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

104. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

105. **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Classes as a whole.

106. **Typicality.** The factual and legal basis of Defendant's liability to Plaintiffs and to the other Class members are the same, resulting in injury to the Plaintiffs and to all of the other members of the Classes. Plaintiffs and the other members of the Classes have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

107. **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable.

108.   **Commonality.** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a.      Whether Defendant's unfair, deceptive, or unlawful acts or practices omitting material facts while promoting coins and/or Card Packs that contained unknown rewards and in-game benefits was unfair or deceptive to a reasonable consumer;

b.      Whether Defendant's unfair or deceptive act or practice of using undisclosed "Dark Patterns" to steer players towards making purchases of "coins," and "loot boxes" designed as  "Card Packs" was unfair or deceptive to a reasonable consumer;

c.      Whether Defendant's failure to provide a method for players to disaffirm any purchases violated their consumer rights;

d.      Whether Plaintiffs and the other Class members were damaged by Defendant's conduct; and

e.      Whether Plaintiffs and the other Class members are entitled to  restitution or other relief.

## FIRST CAUSE OF ACTION
**Unlawful and Unfair Business Practices in Violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*. (On behalf of Plaintiff Vollmuth and the California)**

109.   Plaintiffs hereby incorporate the above allegations in paragraphs 1 through 108 as though fully set forth herein.

110.   Plaintiffs and Defendant are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

111.   California's Unfair Competition Law, Business & Professions Code, § 17200, *et seq*. ("UCL") defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200.

112.   The UCL, prohibits deceptive acts and practices in the sale of consumer products and services, such as Defendant's Royal Match game, and by using dark patterns to manipulate and frustrate Plaintiff and members of the California Class in order to coerce them into spending real cash for in-game currency and in-game purchases.

113.   Defendant's conduct as alleged herein occurred in the course of trade or commerce.

114.   Defendant's conduct is "unlawful" under the UCL by virtue of its violations of the following laws:

> a.    **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq*.)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Lootboxes constitute a "gambling game" because they are a "controlled game," which is "any game of chance, including any gambling device…played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." Cal. Penal Code § 337j(1). As alleged herein, Defendant operates, carries on, conducts, maintains, and exposes for play gambling activities by selling "Loot boxes" in the forms of its Card Packs. Defendant

has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

b.    **California Penal Code § 330a**: Titled "Possession or keeping of slot or card machine or card dice," section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Defendant violates section 330a because as alleged, Defendant possesses or permits illegal slot machines or mechanical devices where money or things of value are won or lost upon chance, by selling "Loot boxes" in the forms of its Card Packs and other in-game Lootboxes.

c.    **California Penal Code § 330b**: Titled "Possession or keeping of slot machines or devices," section 330b declares that "[i]t is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space,

or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." As alleged, Defendant permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code § 330b(d).

d.    **California Penal Code § 330.1, *et seq.*:** Titled "Manufacture, possession, or disposition of slot machines or device," section 330.1(a) declares that "Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports, or exposes for sale or lease, or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used, or kept in any room, space, or building owned, leased, or occupied by him or her or under his or her management or control, any slot machine or device as hereinafter defined, and every person who makes or permits to be made with any person any agreement with reference to any slot machine or device as hereinafter defined, pursuant to which agreement the user thereof, as a result of any element of hazard or chance, may become entitled to receive anything of value or additional chance or right to use that slot machine or device, or to receive any check, slug, token, or memorandum, whether of value or otherwise, entitling the holder to receive anything of value, is guilty of a misdemeanor." Defendant violates section 330.1 because as alleged, Defendant possesses or permits illegal slot machines or devices where things of value are won as a result of chance "irrespective of whether it may, apart from any element of hazard or chance, also sell, deliver, or present some…entertainment, or other thing of value" (Cal Penal Code § 330.1(f)).

e.    **California Penal Code § 337j(a)(1):** By "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed gambling in this state, Defendant violates Penal Code § 337j(a)(1).

f.    **California Penal Code § 337j(a)(2)**: By "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game," Defendant violates Penal Code § 337j(a)(2).

g.    **California Penal Code § 337j(a)(3)**: Through the "manufacture, distribut[ion], or repair [of] any gambling equipment within the boundaries of this state" or "receiv[ing], directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state" Defendant violates Penal Code § 337j(a)(3).

h.    **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA):** The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business. Defendant violates the IGBA because its business involves five or more persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein with respect to its sale of virtual currency (in the form of coins) and Lootboxes (in the form of Card Packs and other in-game pack), Defendant violates 18 U.S.C. § 1955.

i.    **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA"):** The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 15 U.S.C. § 5362(10)(a). By accepting payment

in connection with unlawful Lootbox gambling, Defendant has violated the UIGEA.

115.  Defendant's conduct is "unfair" under the UCL because the user interface in the Royal Match game incorporates undisclosed dark pattern design elements such as "Pay to Play" and "Intermediate Currency," including related monetary traps through Limited Time Deals, Card Packs and other Lootboxes. These tactics are deceptive because they are designed to coerce action and manipulate users into making certain decisions in the Royal Match game against their own interests, with real monetary loss to users such as the Plaintiff Vollmuth and other members of the California Class.

116.  Defendant's conduct described herein is also "unfair" under the UCL because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, as Defendant fails to disclose the actual odds of obtaining any valuable reward by coins, Card Packs and other in-game Lootbox purchases while unlawfully any refunds they seek for receiving worthless rewards and/or prizes.

117.  Defendant's conduct is also a fraudulent business practice within the meaning of the UCL in that Defendant intentionally and knowingly omitted information on the actual odds of obtaining any valuable reward by purchasing Card Packs and other in-game lootboxes, when Defendant knew the actual odds of obtaining any valuable reward were always the same and Defendant knew that users are more susceptible to these addiction-enhancing elements of game design (i.e. experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items) which constitutes gambling.

118.  In addition, Defendant's conduct constitutes a fraudulent business practice within the meaning of the UCL in that Defendant intentionally,

knowingly and explicitly represented that no refunds whatsoever are permitted for any in game purchases in Royal Match.

119. Plaintiff Vollmuth and the California Class members relied on Defendant's omission in that they were unaware that they had a very low likelihood of actually obtaining any valuable reward and/or prize from their purchase of coins and/or Card Packs.

120. Defendant's conduct deceived Plaintiff Vollmuth, and is likely to continue to deceive the general public unless enjoined.

121. Defendant knew or should have known that its omissions regarding the in-game purchases were false, deceptive, and misleading, but Defendant has nonetheless failed to offer to provide Plaintiff and the other members of the Subclass refunds.

122. As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff Vollmuth and other members of California Class suffered actual damages, including monetary losses.

123. Pursuant to Bus. & Prof. Code § 17203, Plaintiff Vollmuth seeks an injunction on behalf of the general public enjoining Defendant from continuing to engage in the conduct described above as Defendant's wrongful conduct is ongoing.

124. Plaintiff Vollmuth also seeks rescission and an order requiring Defendant to make full restitution and to disgorge its ill-gotten gains wrongfully obtained from members of the Subclass as permitted by Bus. & Prof. Code § 17203.

125. Additionally, Plaintiff Vollmuth and the California Class members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

///

///

## SECOND CAUSE OF ACTION
### Violations of the Washington Consumer Protection Act
#### (Wash. Rev. Code §§ 19.86.010, *et seq.*
#### (On behalf of Plaintiff Strong and the Washington Class)

126.  Plaintiffs hereby incorporate the above allegations in paragraphs 1 through 108 as though fully set forth herein.

127.  The Washington Consumer Protection Act ("WCPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.010.

128.  Defendant engaged in the omissions or otherwise committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010 as Defendant received payments from Plaintiff Strong and the other members of the Washington Class in Washington state, and designed, managed, and deployed its Royal Match game from Washington state.

129.  Furthermore, Defendant engaged in unfair or deceptive acts or practices through its omissions and conduct described herein in the sale of consumer products and services, such as Defendant's Royal Match game, and by using undisclosed dark patterns to manipulate and frustrate Plaintiff Strong and members of the Washington Class in order to induce them into spending real cash for in-game currency and in-game purchases without disclosure and completely omitting the odds of winning any particular prize. As a result, most purchases were ultimately worthless.

130.  Defendant's conduct described herein is "unfair" under the WCPA because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, as Defendant fails to disclose and otherwise omits the actual odds of obtaining any valuable reward by purchasing coins, Card Packs and other in-game Lootboxes while unlawfully denying any refunds they seek for receiving worthless rewards and/or prizes.

131.  Defendant's conduct is also "unfair", under the WPCA, because the user interface in the Royal Match game incorporates undisclosed dark pattern design elements such as "Pay to Play" and "Intermediate Currency," including related monetary traps through Limited Time Deals and Card Packs. These tactics are deceptive because they are designed to coerce action and manipulate users into making certain decisions in the Royal Match game against their own interests, with real monetary loss to users such as the Plaintiff and other members of the Washington Class.

132.  Defendant's conduct also constitutes a fraudulent business practice within the meaning of the WCPA in that Defendant intentionally and knowingly omitted information about the actual odds of obtaining any valuable reward by purchasing Card Packs and other in-game Lootboxes, when Defendant knew the actual odds of obtaining any valuable reward were always the same and Defendant knew that users are more susceptible to these addiction-enhancing elements of game design (i.e. experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items) which constitutes gambling. Such omissions misled Plaintiff and the other Class and Subclass members and are likely to mislead the public.

133.  Defendant has also not implemented and intentionally omitted any feature that provides insight as to what rewards and/or prizes a player will obtain when they make any given purchase of coins and/or Card Packs.

134.  Plaintiff Strong and putative Washington Class members acted on Defendant's omissions in that they were unaware that they had a very low likelihood of actually obtaining any valuable reward and/or prize from their purchase of coins, Card Packs and other in-game Lootboxes.

135.  Defendant knew or should have known that its omissions regarding the in-game purchases were false, unfair, deceptive, or misleading acts or practices, but

Defendant has nonetheless failed to offer to provide Plaintiff Strong and the other members of the Washington Class.

136.   Defendant's conduct described herein constitutes an unfair business practice because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

137.   As a direct causal link between Defendant's deceptive or unfair trade acts or practices, Plaintiff Strong and the other members of the Washington Class, suffered actual damages, including monetary losses.

138.   Plaintiff seeks to enjoin further unfair and fraudulent acts or practices by Defendant, recover damages, and obtain all other relief allowed under Wash. Rev. Code § 19.86.010.

### THIRD CAUSE OF ACTION
#### Restitution or Unjust Enrichment
#### In the Alternative to Count II & III
#### (On behalf of Plaintiffs and the Classes)

139.   Plaintiffs hereby incorporate the above allegations in paragraphs 1 through 108 as though fully set forth herein.

140.   Plaintiffs and the other Class members conferred an economic benefit on Defendant through their in-game purchases.

141.   It is inequitable and unjust for Defendant to retain the revenues obtained from in- game purchases made by Plaintiffs and the other Class members that are refundable or voidable by law, when Defendant does not permit refunds of purchases of its in-game virtual currency and in-game items.

142.   It is also inequitable and unjust for Defendant to retain the revenue obtained from in-game purchases made by Plaintiffs and the other Class members due to the undisclosed dark patterns incorporated in Defendant's Royal Match game that were designed to manipulate players and coerce them into making purchases of in-game coins, Card Packs and other in-game Lootboxes that did not allow Plaintiffs and the other Class members to see the value of the rewards and/or prize that they were

purchasing, obtain a refund for their purchases, and for which Plaintiffs and the Class members did not receive any valuable items.

143.   Accordingly, because Defendant will be unjustly enriched if it is allowed to retain such funds, Defendant must pay restitution to Plaintiffs and the other Class and members in the amount which Defendant was unjustly enriched by each of their in-game purchases.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, on their own behalf and on behalf of all others similarly situated, the following relief:

1.   For an order certifying this action as a class action, defining the Classes as requested herein, appointing Plaintiffs as class representatives and their counsel as class counsel;

2.   Declaring that the sales contracts between Defendant and Plaintiffs and the Class members are voidable;

3.   Awarding Plaintiffs all economic, monetary, actual, consequential, compensatory, and punitive damages available at law;

4.   Awarding Plaintiffs' reasonable attorneys' fees, costs, and other litigation expenses;

5.   Awarding pre- and post-judgment interest, as allowable by law;

6.   For public injunctive relief as the Court may deem proper; and

7.   Awarding such further and other relief as the Court deems just and equitable.

///

///

///

///

///

## **JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: September 11, 2024          Respectfully submitted,

**KALIELGOLD PLLC**

By:*/s/ Jeffrey D. Kaliel*
     Jeffrey D. Kaliel
     Sophia G. Gold
     Amanda J. Rosenberg

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.

*Counsel for Plaintiffs and the Proposed Classes*

CLASS ACTION COMPLAINT